296 P.2d 717

**H. A. HARMAN and C. O. Byrd, Appellants,**

**v.**

**A. R. BYRD, Jr., and Helene K. Byrd, his wife; J. H. Byrd and Dian Byrd, his wife; Byrd Investment Company, a corporation; and A. R. Byrd, Jr., and J. H. Byrd, general partners of Byrd Mining Company, a limited partnership, Appellees.**

No. 6033.

Supreme Court of Arizona.

May 1, 1956.

Boyle, Bilby, Thompson & Shoenhair, and Richard B. Evans, Tucson, for appellants.

Udall & Udall, Tucson, for appellees.

ELMER, Superior Court Judge.

Appellants, plaintiffs in the court below, filed an action against the appellees, defendants below, for an accounting, sought as the result of a joint venture which existed between them involving the operation of a group of mining claims in the Patagonia Mining District of Santa Cruz County, Arizona, known and referred to as the Duquesne Mine. Defendants filed their answer to the complaint, denying that plaintiffs were entitled to an accounting and set up the affirmative defense of compromise and settlement, and also filed their counterclaim, demanding an accounting. The issue of compromise and settlement was tried to the court without a jury. No findings and conclusions were demanded and the court, determining that defendants had satisfactorily established the defense of compromise and settlement, rendered judgment dismissing the complaint, with prejudice; dismissing the counterclaim, with prejudice; and awarding defendants their costs. Motion for new trial was made and denied. The appeal is from the judgment.

The plaintiffs have assailed the judgment as not being justified by the evidence, contrary to the evidence and contrary to law. In order, therefore, to have an understanding of the dispute between the parties, it is necessary to review the evidence, which, because of its many ramifications, we set forth rather extensively in narrative form, substantially as follows:

Plaintiff C. O. Byrd and defendants A. R. Byrd, Jr. and J. H. Byrd are brothers, all of advanced years. Prior to October, 1944, defendant A. R. Byrd, Jr., owned a 70% interest in the Duquesne Mine, a group of some 76 claims. He assigned certain percentages of his interest to others of his family. The remaining 30% of the Duquesne was acquired by the plaintiffs in October, 1944; thereafter the properties were operated as a joint mining venture between the plaintiffs and defendant A. R. Byrd, Jr., acting on his own behalf and on behalf of the various members of the family, other than plaintiff C. O. Byrd. This continued until September 30, 1945, when a limited partnership called the Byrd Mining Com-

pany was organized and took over the 70% interest previously held by said A. R. Byrd, Jr., and the joint venture continued between the plaintiffs and the defendant Byrd Mining Company, until May 6, 1946, at which time the Byrd Investment Company, a corporation, was formed and the limited partnership transferred its 70% interest to the corporation. The joint venture continued from that date between plaintiffs and the defendant corporation until May 21, 1951, at which time the Duquesne Mine and the Pride of the West Mine, which will be hereinafter mentioned, were transferred by lease and option contract to one James P. Nash.

In November, 1945, plaintiff C. O. Byrd acquired title to the Pride of the West group of mining claims, which group was entirely surrounded by the Duquesne properties. In January, 1946, plaintiff C. O. Byrd offered in writing to sell to defendant A. R. Byrd, Jr., a 70% interest in the Pride of the West claims for $1,500. This offer was accepted and he was paid $250 cash and the balance was evidenced by the promissory note of the Byrd Investment Company in the principal amount of $1,250, due on July 2, 1947, with interest thereon from date until paid at the rate of 6% per annum. On September 23, 1947, defendants paid $250 in cash on this note, and an additional $300 in cash on December 20, 1947. The contract provided that plaintiff C. O. Byrd would retain all royalties from ores produced and shipped from the property to and including August 1, 1946; after that date defendant A. R. Byrd, Jr., was to receive 70% thereof and plaintiff C. O. Byrd the remaining 30%. It further provided that the seller would make and deliver a deed to the buyer, conveying the 70% interest, at any time on request. None was ever given or requested, but from August 1, 1946, until sometime in early 1948, when the mine ceased operating, the royalties from the operations were divided, as agreed. Operations were resumed by plaintiff C. O. Byrd, through a lessee, about July, 1948, and the shipments from the Pride of the West were made in said plaintiff's name; no royalties therefrom were paid to defendants. Defendant A. R. Byrd, Jr., complained of this to his brother C. O. Byrd about September, 1948, at which time C. O. Byrd advised A. R. Byrd, Jr., that he had defaulted on his agreement and had no further interest in the Pride of the West group. Thereafter C. O. Byrd continued to make shipments from this property in his own name and never made any accounting to anyone for any of the ores so shipped. It should be noted in passing no provision was made in the contract for a default or foreclosure, nor was such achieved by any legal proceeding. It also seems appropriate to observe here that at no time did the plaintiff Harman have any interest in the Pride of the West group.

The evidence shows that plaintiff C. O. Byrd has a home on the mine, in which he resided. His brothers, defendants herein,

resided in Tucson, where the office of their Company was maintained. Throughout the operations of the Duquesne Mine defendant A. R. Byrd, Jr., had charge thereof on behalf of the litigants; the books and records were kept at the Company offices in Tucson, proceeds from operations were received and banked there under his immediate supervision, although it does appear there were times when plaintiff C. O. Byrd either had the power to countersign their bank checks or to independently draw them. In any event, a dispute arose between the parties as early as 1946 concerning the handling of the Duquesne Mine funds, complaint being made by plaintiffs that the bookkeeping was improperly done; that Duquesne Mine funds were being improperly diverted to other enterprises in which the defendant brothers were interested and in which plaintiffs had no interest; and that funds were not being properly disbursed. An audit was made of the books by a Texas auditor selected by plaintiffs which showed defendants to be indebted to plaintiffs in the approximate sum of $13,000, which audit was promptly challenged by defendants as being inaccurate because, as they say, C. O. Byrd had changed the check stubs and that the auditor had, in accordance with his instructions, treated all money paid to him as receivables and not as money paid to him and his co-plaintiff. Defendants claimed a true audit would show plaintiffs indebted to them in the amount of approximately $20,000. A second audit was made by the same auditor as late as 1950 which showed about $30,000 owing plaintiffs, which audit was again disputed for like reasons. Defendants admitted this dispute continued right up to a short time before the deal with Nash, and plaintiffs, of course, contend it still continues.

The negotiations with Nash for the sale of the Duquesne Mine extended over a period of several months, commencing in January, 1951. The agreed price for the Duquesne Mine was $200,000, with down payment of $60,000 in cash, but when Nash learned that the Pride of the West group was not included in the offer, his interest waned. C. O. Byrd had originally refused to permit the Pride of the West to go in on the deal, but finally did agree to include it. The contention of defendants and their evidence is that this was brought about in the following manner:

Defendant A. R. Byrd testified that a short time prior to the sale to Nash, he called his brother, plaintiff C. O. Byrd outside of the office of the Byrd Investment Company in Tucson and informed him that he had been authorized by the stockholders of that corporation to make him (C. O. Byrd) a proposal in complete settlement of all claims he asserted against them, or any of them. He offered to forego any claim they had to royalties collected by C. O. Byrd from the Pride of the West operation, the evidence of defendants showing that the 70% interest in the royalties claimed by

them amounted to about $4,500. He further offered that if plaintiff C. O. Byrd would sell the Pride of the West group to Nash for $10,000, they would also forego any claim which they might have or assert to their alleged 70% interest as owners therein. A. R. Byrd testified that in return C. O. Byrd was "to settle all controversy and all claims of every kind against any of us or against the company", and further testified in effect that C. O. Byrd accepted this proposal.

Defendants contend that by reason of the above conversation a compromise and settlement agreement was thereby made. Corroborative evidence came from the lips of J. H. Byrd and Fred W. Fickett, an attorney. J. H. Byrd testified that he was not present at the meeting outside the office but he was inside and that when they came back in "they agreed they had made a settlement". Mr. Fickett, the only stockholder of defendant corporation other than family members, testified that after the contract was signed in his office, with all parties present except plaintiff Harman, Mr. Nash wanted to know who the $60,000 should be made payable to; that it was agreed it would be made to Fickett; that he had been handed a list of disbursements which the parties had instructed him to make therefrom, which included a $7,000 payment to be made to him on account of moneys he had loaned the defendants, secured by a mortgage on their interest in the Duquesne Mine; that at about that same time C. O. Byrd asked to be informed as to what the money was to be spent for, and, when shown the list, he objected to his bearing any part of the Fickett payment from his share; that thereupon the witness, with C. O. Byrd and A. R. Byrd, Jr., repaired to another room in his office, where C. O. Byrd was reminded he had previously seen the disbursement list, which included the $7,000 for Fickett, and had approved it; that his 30% of the $7,000 was only $2,100, whereupon he suggested the matter be arbitrated, and the brothers agreed another brother, Edward, could arbitrate it if he would; that Fickett then inquired whether or not this was their agreement, and C. O. Byrd stated to A. R. Byrd, Jr., "well, let's let Ed arbitrate all of our differences." Thereupon, Fickett quoted A. R. Byrd as saying:

" 'All of our other differences have been settled; we have given you the Pride of the West and waived our claim to it and you have taken it in settlement of all our differences and if our differences aren't settled, we are not going through with the Nash deal and if the Nash deal goes through it goes through on that basis and is that O.K.', and C. O. said 'It is O.K.'."

C. O. Byrd has denied that the conversation outside the office ever took place; he has denied the testimony of his brother J. H. Byrd as to his coming back into the office and stating, in effect, that the differences

had been settled; he testified in effect that as to the statement which Fickett heard A. R. Byrd make ended with A. R. Byrd, Jr., saying "we will call the Nash deal off" and that his answering O.K. meant that he was agreeable to calling the deal off. He has denied that there was ever any compromise and settlement effected.

The brother Edward refused to arbitrate the differences over the $2,100 and this sum was eventually paid by Fickett to the defendants.

It is to be here observed that subsequent to the closing of the Nash deal C. O. Byrd continued to demand a settlement; that A. R. Byrd, Jr., wrote him a number of letters, admitted in evidence, which indicate a desire to compose differences, refer to questions which A. R. Byrd, Jr., desired the auditor to answer before he could give C. O. Byrd a reply, and fail to mention that a compromise was effected at the time of the sale to Nash. It is further to be noted that at no time did the directors or stockholders of Byrd Investment Company adopt a resolution with respect to the compromise said to have been effected by A. R. Byrd until June 2, 1954, the day before the trial, when the directors adopted a resolution ratifying the act.

As hereinbefore stated, the appellant Harman was a partner with appellant C. O. Byrd in the 30% interest in the Duquesne Mine; he had no interest in the Pride of the West and received no part of the sale price thereof. In 1947 he informed appellees he had given Duane Bird, an attorney in Nogales (not related to the parties herein), full power of attorney to act for him in all matters pertaining to the management of the Duquesne Mine. There is no evidence to show Mr. Bird ever accepted the appointment or had any dealings whatever with the parties to this action.

It is admitted that Harman had given C. O. Byrd a deed to his interest in the Duquesne Mine some year and a half prior to the Nash sale and C. O. Byrd testified that he was fully authorized to represent the Harman interest; Mr. Harman lived in Texas, C. O. Byrd at the mine and throughout their partnership in the Duquesne C. O. Byrd had been the active partner, acting on behalf of both of them. Mr. Harman did not execute the contract with Mr. Nash; C. O. Byrd placed his deed from Harman of record just in time to consummate the Nash deal.

There are three assignments of error, the first of which is that there was no corroboration of the compromise and settlement agreement; that the evidence thereof was contradicted and was wholly insufficient to support the judgment. Plaintiffs urge the proposition of law that a party who relies upon a compromise and settlement agreement must prove its existence by a preponderance of the evidence and that the

uncorroborated testimony of one party, contradicted by the other, is insufficient.

■ We are of the view that there was ample corroboration of an agreement of compromise from the testimony of Fickett and J. H. Byrd, heretofore related. This being so it is unnecessary to discuss or rule upon the proposition as to whether in this jurisdiction it is or is not the law that such corroboration is necessary.

The second assignment is that there was no evidence that plaintiff Harman at any time entered into an agreement of compromise and settlement; that he at any time authorized his co-plaintiff, C. O. Byrd, to enter into any such an agreement on his behalf or that he is bound by any agreement that may have been made. The proposition of law urged in support of this assignment is that no person can be bound by an agreement of compromise and settlement if he is not a party thereto.

The problems presented by this assignment are:

(1) Whether the agency of C. O. Byrd to act for Harman was established by his (Byrd's) testimony and the surrounding facts and circumstances; and

(2) Whether there was any consideration passing to Harman as a result of the compromise agreement.

It is argued that Harman had no interest whatsoever in the Pride of the West group;

that even admitting for the purpose of argument that C. O. Byrd had made a settlement, the only consideration exchanged had application to differences between C. O. Byrd and his brothers because the only forbearance of defendants was to surrender their claim to royalties from the Pride of the West Mine retained by C. O. Byrd and their surrender of their alleged 70% ownership interest in that group, by permitting C. O. Byrd alone to retain all of the $10,000 purchase price thereof which Nash agreed to pay. Plaintiffs point out that as early as 1946 Harman had complained of the handling of the funds from operations of the Duquesne Mine by the defendants and had gone so far as to appoint Duane Bird to act for him.

■ We have already decided, in the case of Daly v. Williams, 78 Ariz. 382, 280 P.2d 701, that when the fact of agency rests in parol, it may be established on a trial by the testimony of the agent himself, and that while the agent's extrajudicial statements are not admissible to prove the fact of his agency, such fact may, when it rests in parol, be established on the trial by his testimony. As hereinbefore set forth, C. O. Byrd testified he was fully authorized to bind Harman; the latter had deeded his interest in the Duquesne Mine to C. O. Byrd a long time prior to the Nash deal. C. O. Byrd testified he was holding it for Harman's benefit. This evidence justified the trial court in finding that Harman had

authorized C. O. Byrd to act for him concerning all his interest resulting from his dealings with the Duquesne Mine.

■ As to a lack of consideration flowing to Harman, it must be remembered that these litigants had been at odds for some years. The opportunity to conclude these differences was presented when Nash contracted to buy both properties, the Duquesne Mine being included therein at a price of $200,000. If, despite his deed to C. O. Byrd, Harman still owned his 15% interest in the Duquesne Mine, his gross share of the price would be $30,000. The necessity of selling the mine to permit the owners to realize something therefrom was apparently impelling. The evidence indicates that the operations of the joint venture on the Duquesne Mine had resulted in failure; at the time of the contract with Nash numerous and sizeable debts were unpaid and Government liens had been filed they had only a few days to settle. From the foregoing it appears that the trial court was warranted in ruling that Harman received the benefit from a sale of the Duquesne Mine and this was sufficient consideration for the settlement agreement so far as Harman's interests were concerned.

The third and last assignment of error is that the trial court erred in entering judgment for the defendants for the reason there was no sufficient consideration for the alleged agreement of compromise and settlement, in that any claim defendants made to the Pride of the West Mine was baseless, not made in good faith, and without foundation in law and in equity.

■■ The proposition of law relied on by plaintiffs is that unless there is a bona fide dispute upon which to base a valid compromise, the claim falls within the class of baseless claims and does not constitute a valuable consideration sufficient to support an agreement of compromise and settlement. We agree with this legal proposition and have so held in Brecht v. Hammons, 35 Ariz. 383, 278 P. 381. But it is our view that the trial court could well find there was a bona fide dispute between C. O. Byrd and the defendants with regard to the Pride of the West Mine. C. O. Byrd pursued no legal remedy whatever to terminate the contract he made with his brother for the sale of the 70% interest in that property. While it is true the note evidencing a portion of the purchase price was not paid in cash, nothing was ever done by C. O. Byrd to legally collect it, nor was anything legally done by him to terminate the defendants' right to receive royalties from ore production from that property. There was nothing in the contract for the sale of the 70% interest to A. R. Byrd, Jr., which provided for a forfeiture in the event of nonpayment of the purchase price or any other breach. While C. O. Byrd might have prevailed in an action for rescission, he did not have the right to arbitrarily declare a forfeiture and

the claim of the defendants was not, therefore, a baseless claim.

We have carefully considered all of the record in this case and finding no error therein, the judgment of the trial court is affirmed.

LA PRADE, C. J., and WINDES, PHELPS and STRUCKMEYER, JJ., concur.

UDALL, J., having disqualified himself, the Honorable CHARLES P. ELMER, Judge of the Superior Court of Mohave County, participated in his stead in the determination of this appeal.